Page 1

1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF FLORIDA
2
                     JUDGE A. JAY CRISTOL
3

4    IN RE:

5    PAUL R. CAPUTO,          CASE NO: 12-23166-BKC-AJC
             Debtor.
6    _____ /

7

8

9                    EVIDENTIARY HEARING RE:
               OBJECTION TO CLAIM OF CAMILE CAPUTO (85).
10

11
                          MAY 16, 2013
12

13

14          The above-entitled cause came on for hearing

15   before the HONORABLE A. JAY CRISTOL, one of the Judges

16   in the UNITED STATES BANKRUPTCY COURT, in and for the

17   SOUTHERN DISTRICT OF FLORIDA AT LARGE, at 51 SW 1st

18   Avenue, Miami, Dade County, Florida, commencing at or

19   about 11:00 a.m. on May 16th, 2013, and the following

20   proceedings were had:

21

22

23

24                   Reported by: Carmen E. De La Cruz

25

Page 2

1                    APPEARANCES:

2


3          BANKRUPTCY RESOURCE CENTER, by
           MICHAEL A. FRANK, Esquire
4          On behalf of the Debtor.

5


6          DIEPPA LAW FIRM, by
7          EDUARDO DIEPPA, Esquire
           On behalf of the creditor,
8          Camile Caputo.

9

10

11
     WITNESS          DIRECT    CROSS    REDIRECT    RECROSS
12
   CAMILE CAPUTO
13 (BY MR. DIEPPA)     6                    33
   (BY MR. FRANK)               23                    --
14

15 PAUL CAPUTO
   (BY MR. DIEPPA)    34                    52
16 (BY MR. FRANK)               49                    55

17

18

19      EXHIBITS                          Page

20 EXHIBITS c-1, c-3 thought C-10          6
    (with exception of C-2)
21

22

23

24

25

1          THE COURT:  Paul Caputo.

2          MR. FRANK:  Michael Frank on behalf of the

3    debtor.

4          MR. DIEPPA:  Eduardo Dieppa of the Dieppa

5    Law Firm on behalf of creditor, Camile Caputo, the

6    ex-spouse.

7          THE COURT:  Very well.

8          MR. FRANK:  And both Mr. and Mrs. Caputo

9    are both present.

10          THE COURT:  Okay.  Attached to the

11    response filed by Camile Caputo is a, what do you call

12    it, one page, 93-2, it's an interesting piece of paper

13    with both the signatures of Mr. Paul Caputo and Camile

14    Caputo on it.

15          Have you seen this, Mr. Frank?

16          MR. FRANK:  Yes, Judge.

17          THE COURT:  Okay.

18          MR. FRANK:  I believe it's an exhibit.

19          THE COURT:  Okay.  Then why shouldn't this

20    matter be determined as to be --

21          MR. FRANK:  I can give a real simple

22    explanation, Judge.  That was entered into prior to

23    the actual marital settlement agreement which said

24    it's equitable distribution in which both parties

25    waived any alimony, including lump sum alimony.

1          It was also mentioned in the addendum to

2    the marital settlement agreement, which is Exhibit 9,

3    where they state in Paragraph 13, the former husband

4    has filed for bankruptcy, the former wife was

5    therefore not able to proceed with her motion to

6    enforce the marital settlement agreement as it relates

7    to the funds owed to her by the former husband

8    pursuant to Paragraph XVIII of the agreement.  The

9    former husband acknowledges that he owes the former

10   wife the sum of $210,000 as an equitable distribution.

11         We also then look at Exhibit 10 in the

12   exhibit register which states there is a list of

13   payments made by Mr. Caputo on this agreement and at

14   the top of the distribution amount it says Caputo and

15   Caputo equitable distribution payments to wife per

16   MSA.

17         So, everywhere after that agreement was

18   done, which this was done before the divorce, says

19   it's an equitable distribution.

20         THE COURT:  And was Mrs. Caputo

21   represented by an attorney?

22         MR. FRANK:  Yes, she was, Judge, and still

23   is.

24         THE COURT:  And who was the attorney?

25         MS. CAPUTO:  I was not represented by an

1   attorney at the time when I signed my divorce

2   agreement.

3                THE COURT:  Okay.  Well, who wants to put

4   on what?

5                MR. DIEPPA:  Your Honor, if we may.

6                THE COURT:  You may.

7                MR. DIEPPA:  I would like the call

8   Mrs. Caputo to the stand.

9                THE COURT:  You may.

10                MR. DIEPPA:  Your Honor, for the record,

11   we agreed, with your permission, on certain exhibits.

12   If I may give you a copy.

13                THE COURT:  You may.  Thank you.

14                MR. DIEPPA:  Counsel conferred and we

15   agreed to admit all the exhibits filed, with the

16   exclusion of C-2, which is the sworn affidavit.  Given

17   that Mrs. Caputo is here to testify, it's not really

18   necessary, and so, we would like to proceed and admit

19   the remaining exhibits C-1 and C-3 through C-10.

20                THE COURT:  Any objection?

21                MR. FRANK:  Yes, Judge.  Only with respect

22   to C-1, we both agreed that it is missing Page 11 of

23   the marital settlement agreement which is the second

24   half of the waiver of the alimony provision.  It's

25   just standard, says it basically waives all future

Page 6

1   alimony, lump sum, it's periodic, et cetera.

2            It was just missing, but it's still part

3   of that waiver of the alimony, which the actual

4   heading of the paragraph is there on Page 10.

5            THE COURT:  All right.  Then, as indicated

6   on the record, the documents are admitted with the

7   exception of C-2 and the comment noted about the

8   contents of the agreement.

9         (Thereupon, Exhibit Nos. C-1, C-3 through C-10

10  were admitted in evidence, with the exception of C-2.)

11           THE COURT:  What about you, Mr. Frank, do

12  you have any --

13           MR. FRANK:  No, these are all the

14  exhibits.

15           THE COURT:  Oh, these are from everybody.

16  Oh, okay.  That makes it easier.  Thank you.  Proceed.

17  THEREUPON:

18                  CAMILE CAPUTO,

19  after having been first duly sworn, was examined and

20  testified as follows:

21               DIRECT EXAMINATION

22  BY MR. DIEPPA:

23     Q.   Can you please state your name for the

24  record?

25     A.   Camile Caputo.

1      Q.    Ms. Caputo, were you married to the debtor,

2  Mr. Paul Caputo?

3      A.    Yes.

4      Q.    And that marriage ended pursuant to a final

5  judgment of divorce; is that correct?

6      A.    Yes.

7      Q.    If you would open the exhibit book and look

8  at Exhibit C-1.  Is that the final judgment and

9  marital settlement agreement, taking into account that

10  we know that there's a page missing, but please let me

11  know if that appears to be the agreement by which your

12  marriage to Paul Caputo was ended?

13      A.    Yes.

14      Q.    Did Mr. Caputo have an obligation to make,

15  aside from child support, did he have any other

16  obligations to pay you pursuant to the agreement?

17      A.    Yes, he did.

18      Q.    What was he supposed to -- obligated to pay

19  you after the divorce, aside from the child support?

20      A.    He was supposed to pay me money because he

21  called it equitable distribution and said it was going

22  to be alimony, but the reason he called it equitable

23  distribution was that the money was going to be coming

24  from the equity from the marital home, at which point

25  I had to sign some loan documents for a hundred and

1    twenty thousand dollars, I believe, and which part of

2    that money or all of that money would be going for my

3    alimony or equitable distribution.  He changed the

4    names all the time.

5         Q.    At the time that this marital settlement was

6    entered, were you represented by an attorney?

7         A.    No.

8         Q.    Did you have any -- did any attorney provide

9    any work for you with respect to this agreement or the

10   final judgment?

11        A.    I was unemployed at the time and I could not

12   afford to hire an attorney.  For the sake of keeping

13   peace in the family, I trusted my husband.  He said

14   that he would do what he had written in the agreement,

15   he gave me $500 and said go see a lawyer, that's all

16   you're getting.  And I had somebody review it and they

17   said, if you trust your husband, then it's absolutely

18   fine.

19        Q.    And what was the name of that person, do you

20   recall?

21        A.    Patricia Khan and she's out of Seattle.

22              THE COURT:  Out of where?

23              MS. CAPUTO:  Seattle.

24              THE COURT:  Oh, I see.

25   BY MR. DIEPPA:

1    Q.    So you testified at the time of the divorce
2    you were not employed?
3    A.    That's correct.
4    Q.    What was your work history up until that
5    point?
6    A.    We had a family business where we were taking
7    care of children, it was sort of daycare school,
8    children's facilities, learning center.
9    Q.    Did you have any consistent income from that
10   family business that was paid to you directly?
11   A.    It was a business that we started during the
12   marriage.  And to keep money in the business, I -- my
13   paycheck was about $200 a week.  And after the divorce
14   I had to walk away from the business because I wasn't
15   getting my equitable distribution or any money that I
16   was promised per the agreement and I had to find a job
17   that would pay me more than $200 a week.
18   Q.    And what were you paid at the new job that
19   you obtained after the divorce?
20   A.    Well, it took several months to find
21   employment and in the beginning I was cleaning houses
22   and had a waitressing job until I was hired at the
23   Miami Herald.
24   Q.    What was your salary at The Herald?
25   A.    I believe it was about $35,000.

1    Q.    Annually?

2    A.    Yes.

3    Q.    Was Paul working at the time of your divorce?

4    A.    I believe so.

5    Q.    What did Paul do at that time for work or

6    for --

7              MR. FRANK:  I'm going to object, Judge.

8    She just testified she believed so.  So now how can

9    she testify as to what he was doing.

10              THE COURT:  Okay.  Sustain the objection.

11    BY MR. DIEPPA:

12    Q.    Did Paul have income at the time of your

13    divorce?

14    A.    Yes.

15    Q.    Do you know what his income was at the time

16    of your divorce?

17    A.    He was buying properties and buying mortgages

18    and I don't know what the income was, but he always

19    told me that he was worth millions of dollars on

20    paper, whatever that means.

21    Q.    Okay.  Now, as part of the divorce you agreed

22    to give up your rights to the marital home?

23    A.    Yes.

24    Q.    What was the address of that property?

25    A.    550 Northeast 56 Street, Miami, Florida

1    33137.

2         Q.   When did you buy it?

3         A.   I believe it was purchased -- I'm not sure.

4         Q.   Do you know what it was worth at the time of

5    the divorce, when you finalized your divorce?

6         A.   In excess of $900,000.

7         Q.   Who retained control of the property after

8    the divorce?

9         A.   Paul did.

10        Q.   Was he living there?

11        A.   Yes.

12        Q.   Did Paul ask you to take on debt or agree to

13   become a co-signer on debt as part of the divorce?

14        A.   Yes, he did.

15        Q.   Why did he ask you to do that?

16        A.   Because he said the alimony would be called

17   equitable distribution because the debt would be an

18   equity line of credit that we would both have to sign

19   and that would be the money that he would pay me.

20        Q.   If you look at Exhibit C-5, does that -- do

21   these documents look familiar to you?

22        A.   Yes.

23        Q.   What are these documents that you provided to

24   me which is now C-5 in evidence?

25        A.   This is a loan that I was persuaded heavily

1   to sign in order for me to get or be promised to get

2   my equitable distribution, and I was a little bit

3   hesitant to sign it because of the fact that he was

4   pulling more money out of the house and I had to put

5   my name on it, and he told me this was the only way

6   that he would pay me.

7        Q.   Did you receive any of the funds from this

8   loan?

9        A.   I received some funds.

10       Q.   What was the amount of the funds that you

11  received from this loan?

12       A.   I believe I received several payments, not

13  according to the payment schedule as outlined in the

14  settlement agreement, and it was about -- under

15  $19,000 or less than $20,000 over several years.

16       Q.   And that $19,000 was not child support, the

17  thousand dollars a month that you were supposed to

18  receive?

19       A.   No.

20       Q.   Aside from this $19,000, do you know if Paul

21  received a hundred and twenty thousand dollars from

22  this loan?

23       A.   Yes, he did.

24       Q.   At the time of your divorce, aside from the

25  marital home, did you have any other assets of value?

1      A.    Me personally?

2      Q.    Yes.  Did you have savings?

3      A.    No.

4      Q.    Did you have a retirement plan?

5      A.    No.

6      Q.    Did you have any heirlooms?

7      A.    No.

8      Q.    Did you personally own a business?

9      A.    The business that we had together, but I

10 walked away from it.  I don't know what happened to

11 it.

12     Q.    So, as part of your divorce you gave up your

13 rights to the marital home?

14     A.    Yes.

15     Q.    And you gave up the rights to the businesses

16 that you and Paul co-owned?

17     A.    Yes.

18     Q.    Do you know how much income the business was

19 producing?

20     A.    I don't know.  Paul was in charge of the

21 books.

22     Q.    So Paul was buying and selling real estate

23 and he was also operating this other business that you

24 mentioned?

25            MR. FRANK:  Objection.  Leading, Judge.

1          THE COURT:  Sustained

2     BY MR. DIEPPA:

3          Q.    How many businesses did you co-own with Paul?

4          A.    I believe at a point we had two businesses.

5     One called PCG Capital, which are the initials for

6     him, Paul, me, Camile, his wife, and, G, Gabriella,

7     our daughter, and he told me that was the business

8     where he was buying properties and buying mortgages,

9     and where he was making a lot of money.

10         Q.    Do you know if that business is still viable

11    today, is it still active?

12         A.    I don't know.

13         Q.    As part of your divorce who became the

14    primary custody for your child?

15         A.    I did.

16         Q.    And after your divorce where did you move to?

17         A.    I had to move into a small studio apartment

18    and I've been moving, you know, a few times since

19    then.

20         Q.    Did you -- you rented that studio apartment?

21         A.    Yes, I did.

22         Q.    And what was the rent of that apartment?

23         A.    I believe it was about 1,400.

24         Q.    How did you pay the $1,400 in rent for the

25    studio apartment?

1      A.    Paul gave me enough money to get me into the

2   apartment and once I got in he said he had no more

3   money to give me and he said, don't worry, they can't

4   kick you out, you have 60 days until they can do

5   anything.  Just stay there, and --

6      Q.    Do you know why -- or did Paul tell you why

7   he had no more money to give you?

8      A.    No.

9      Q.    Can you look at Exhibit C-8, do you recognize

10  that one-page document?

11     A.    Yes.

12     Q.    Was this signed before you finalized your

13  divorce?

14     A.    They were all signed at the same time and our

15  divorce agreement, I didn't find out until later, that

16  after I signed it Paul kept it in his office drawer

17  until several months later, until November, when he

18  actually filed it.  And he said, he didn't have to pay

19  child support until the divorce was actually filed,

20  which was several months later.

21     Q.    Why did you and Paul sign this one page

22  document?

23     A.    This was our agreement that I would get

24  alimony and, even though he was calling it something

25  else in our divorce agreement, I didn't have a lawyer

1   -- he wouldn't -- I was completely dependent on my

2   husband.  I didn't have legal advice to have someone

3   tell me that alimony -- the difference between alimony

4   and equitable distribution, and because the money was

5   coming from -- my alimony was coming from equity from

6   the house, it sounded like a very reasonable -- it

7   made sense to me.

8        Q.   And that is why -- is that the reason you

9   agreed to this specific language in the marital

10  settlement agreement which is Exhibit C-1?

11       A.   That's correct.

12       Q.   If you look at Page 10.

13       A.   That's correct.

14       Q.   Page 10 of 23, which is your marital

15  settlement agreement, Exhibit C-1, it states each

16  party specifically and unequivocally waive any and all

17  entitlement to any other form of alimony via

18  permanent, periodic, rehabilitative or lump sum.  Do

19  you understand what that means?

20       A.   No.

21       Q.   Did you agree to this language because of

22  this agreement that you had in C-8?

23       A.   Yes.

24       Q.   Were you counting on this $200,000 to be the

25  money that you would live off after your divorce?

1      A.    Yes.

2      Q.    What did you intend to do with that $200,000?

3      A.    Secure a home for my child and myself, pay

4  for food.

5      Q.    Turn to Page 14 of 23 in that same exhibit

6  C-1.  Was there a payment schedule that Paul was

7  supposed to provide to you that $200,000?

8      A.    Yes.

9      Q.    Now, earlier you said you received

10  approximately $19,000 out of the two hundred?

11     A.    There was a total of $12,000 in checks that

12  specifically said settlement agreement.  The remainder

13  of the checks totaling the $19,650 had nothing in the

14  memo.  So, he owed me money for health insurance,

15  debts that we had incurred while we were married,

16  other things.  I don't know what that money was for,

17  but I'm giving him credit towards the alimony.

18     Q.    And when you say credit, you consider $19,650

19  as having been paid out of the two hundred that's owed

20  to you from the equitable settlement?

21     A.    I'm willing to give him credit for that, yes.

22     Q.    Was there a deadline by which the $200,000

23  was to be paid to you?

24     A.    Yes.

25     Q.    And what was that deadline?

1       A.    The deadline was to be paid -- well, there is

2  an installment so each payment has a certain deadline

3  and the whole thing needed to be paid within a certain

4  amount of time.  I don't know.

5       Q.    Look at Page 15 of 23 in Exhibit C-1?

6       A.    Okay.

7       Q.    Until and -- tell me --

8       A.    I'm sorry.

9       Q.    Go ahead.

10      A.    It says, 18 months from the execution of this

11 agreement, husband will pay to the wife the final sum

12 due and owing under this order.  The husband --

13      Q.    The loan document that you signed on page,

14 I'm sorry, on Exhibit C-5 --

15      A.    Yes.

16      Q.    -- Arista Mortgage, LLC, have they contacted

17 you since you signed that loan document?

18      A.    Yes.

19      Q.    Are they still trying collect that hundred

20 and twenty thousand dollars?

21      A.    Yes.

22      Q.    Has any of it been paid to them?

23      A.    Not one payment.

24      Q.    Have they threatened you with any form of

25 collections or lawsuit?

1        A.    Yes.

2        Q.    And have they sued you?

3        A.    Not yet, but they told me they are going to.

4        Q.    Have they filed a mortgage foreclosure on

5   this mortgage; do you know?

6        A.    I don't know.

7        Q.    Have you ever discussed this loan with Paul

8   as to why no payments were made to them?

9        A.    Yes.

10       Q.    What did Paul tell you about this loan?

11       A.    He said, that's not true.

12       Q.    After the divorce, aside from the amounts

13   that Paul gave you, did you have any other income or

14   support?

15       A.    When?

16       Q.    Immediately after your divorce.

17       A.    No.

18       Q.    How were you able to pay the rent?

19       A.    I had to borrow money from my family.  I had

20   to work some part-time jobs until I was employed full

21   time with the Miami Herald, but that took several

22   months.

23       Q.    Approximately, how much did you borrow from

24   family members?

25       A.    I'd say about twenty to $30,000.

1     Q.    Okay.  Prior to your divorce you were living

2  at this property, in what city was it?

3     A.    Miami.

4     Q.    How would you describe this property?

5     A.    It was a large house.  It had a separate

6  guest house attached to that, a big backyard, and it

7  was four bedrooms.  I believe it was almost 4,000

8  square feet.

9     Q.    Do you know how much you and Paul were making

10 combined prior to your divorce?

11          MR. FRANK:  Objection, Judge.  Now, we're

12 getting to irrelevance here.  This is getting far

13 afield from what we're trying to prove.

14          THE COURT:  Why do we need to know that?

15          MR. DIEPPA:  Your Honor, it's relevant

16 because if you -- the case law talks about the living

17 standard of the spouse prior to the --

18          THE COURT:  I'll overrule the objection.

19 BY MR. DIEPPA:

20    Q.    Do you know what, roughly, what your annual

21 combined family income was prior to your divorce?

22    A.    I don't.

23          THE COURT:  Well, that was a very

24 productive exchange.

25 BY MR. DIEPPA:

1     Q.    How would you describe your living standard

2  before the divorce?

3     A.    We lived a very comfortable -- more than

4  comfortable lifestyle.  We had a nanny.  My daughter

5  went to private school.  We had a cleaning lady.  We

6  drove nice cars.

7     Q.    Did you travel?

8     A.    Yes.

9     Q.    Okay.  After your divorce were you able to

10 travel?

11    A.    No.

12    Q.    Were you able to afford a cleaning lady?

13    A.    No.

14    Q.    Were you able to afford a nanny?

15    A.    No.

16    Q.    What type of car were you driving after your

17 divorce?

18    A.    My car got repossessed shortly after my

19 divorce.  So I was without a car for some time.

20    Q.    How did you get by without a car after your

21 divorce?

22    A.    The bus.

23    Q.    How big was the apartment you moved into

24 after your divorce?

25    A.    I believe it was under 500 square feet.

1    Q.   And, specifically, if you can recall, can you

2 provide to the Court what your conversations were

3 about alimony prior to you signing this divorce?  What

4 do you specifically recall discussing with Paul about

5 alimony?

6              MR. FRANK:  I'm going to object, Judge.

7 The agreement speaks for itself.  It was signed.

8              THE COURT:  Sustained.

9              MR. DIEPPA:  Your Honor, if I may.  The

10 case law on this is, regardless of the language, the

11 Court has to look at the intent of the parties.  So,

12 their conversations regarding what they were entering

13 into is relevant and you can't just look at the plain

14 language of the agreement.  The case law says you must

15 look beyond the plain language of the agreement of

16 the parties.

17              THE COURT:  All right.  What was the

18 question again?

19              MR. DIEPPA:  The question was, what were

20 the conversations, what were their discussions about

21 alimony prior to --

22              THE COURT:  All right.  We'll allow that

23 question.

24              THE WITNESS:  My conversation with Paul

25 was that he would pay alimony, but he was going to

1   call it equitable distribution because, once again,

2   this mortgage that we both had to sign on, was an

3   equity loan in which that money was coming from the

4   house.  So he needed to call it alimony/equitable

5   distribution and that would be the money that he'd pay

6   me.

7   BY MR. DIEPPA:

8       Q.   And were you counting on this money to

9   provide for your living expenses?

10      A.   Yes, as I had no job and no other forms of

11  income.

12      Q.   Were you counting on this money to maintain a

13  similar living standard as you had before you got

14  divorced?

15      A.   Yes.

16           MR. DIEPPA:  No further questions,

17  Your Honor.

18           THE COURT:  Cross-examination.

19              CROSS-EXAMINATION

20  BY MR. FRANK:

21      Q.   Good afternoon or almost afternoon,

22  Ms. Caputo.  My name is Michael Frank and, as you

23  know, I represent Mr. Caputo.  I'm going to ask you

24  some questions regarding these documents you signed

25  and your testimony.

1        What you originally stated, what one of your

2   testimony was, that you trusted your husband; right?

3        A.   Yes.

4        Q.   You were getting divorced; right?

5        A.   Yes, sir.

6        Q.   And you trusted your husband?

7        A.   Well, we have a child together.  So I trusted

8   him to do the right thing for the family.

9        Q.   So you did not have a lawyer at the time of

10  this agreement?

11       A.   No.

12       Q.   Okay.  Did Mr. Caputo have a lawyer at the

13  time of this agreement?

14       A.   Yes.

15       Q.   Who was his lawyer?

16       A.   His first name was Hyatt and the last name

17  was Freed.

18       Q.   Hyatt Fried was his lawyer at the time of the

19  original signing of this agreement?

20       A.   That's who I believe his lawyer was.

21       Q.   Okay.  Ms. Caputo, after you got divorced you

22  said you moved into the small studio apartment?

23       A.   That's correct.

24       Q.   And you were receiving some monies from

25  Mr. Caputo?

Page 25

1    A.   In the beginning he was paying for the

2 first --

3    Q.   Who else was in the house with you?

4         THE COURT:  She didn't answer the

5 question?

6         MR. FRANK:  Oh, I'm sorry.

7         THE COURT:  Let her finish.  You may

8 finish your answer, Ms. Caputo.

9         THE WITNESS:  Can you repeat the question

10 again.

11 BY MR. FRANK:

12    Q.   Who else was living with you in the

13 apartment?

14    A.   My daughter.

15    Q.   No one else was ever living in that apartment

16 with you and your daughter?

17    A.   No.

18    Q.   You had no help from any other friends or

19 boyfriends?

20    A.   No.

21    Q.   Okay.  You talked about -- I'll refer you to

22 paragraph, I'm sorry, Exhibit Number 8.  It's a

23 one-paragraph agreement.  You have that in front of

24 you?

25    A.   Yes.

1      Q.    Okay.  This agreement stated that, and it is

2   signed by both you and Mr. Caputo; correct?

3      A.    Yes.

4      Q.    It states that, I, Paul Caputo, agree that in

5   the event of a dissolution of marriage, which means

6   there was no divorce pending at that time; right?

7      A.    Uh-huh.  This was the first document I

8   signed, and then I had to sign the loan documents and

9   then I had to sign the marriage -- divorce document.

10     Q.    But there was no divorce pending at this

11  time, in April of 2006.  You were not divorced yet?

12     A.    He kept the papers in his office.  I didn't

13  realize that until I --

14     Q.    I'm asking you a specific question.  In April

15  of 2007, you were not divorced?

16     A.    We were not legally divorced, but the papers

17  were signed.

18     Q.    Okay.  Now it also says in here, based upon

19  your testimony, you said that you were supposed to be

20  getting paid this hundred twenty thousand dollars

21  because of the equity in the house, correct?

22     A.    And because I signed on it.  Why would I sign

23  a loan if --

24     Q.    Okay.  If you read this paragraph it says

25  that Mr. Caputo will pay to Camile Caputo on or before

Page 27

1    the closing of the sale of that real property;

2    correct?

3         A.    Correct.

4         Q.    Was the property ever sold?

5         A.    He never put it on the market.

6         Q.    Was the property ever sold?

7         A.    I don't know what happened to the property.

8         Q.    Okay.  Now, you also -- I'm going to refer

9    you to Exhibit Number 1, which is the actual marital

10   settlement agreement.  This document was signed in

11   June of 2007?

12        A.    Okay.

13        Q.    In paragraph -- I'm sorry.  In Page 10 of

14   this agreement, I think you referred to that before,

15   that paragraph that starts off with XIV, Alimony, you

16   had specifically waived any right or entitlement to

17   alimony; correct?

18        A.    That's what that says, yes.

19        Q.    Okay.  And you signed this agreement, did you

20   not?

21        A.    Yes.

22        Q.    Okay.  You also stated that you walked away

23   from the business that was yours and Paul's, something

24   called KidScape, I believe it was?

25        A.    Yes.

1      Q.    If you could turn to Page 16 of that same
2  agreement, it's Paragraph D. It says, husband and wife
3  currently own 50 percent of KidScape, with the wife
4  owning 30 percent and the husband owning 20 percent.
5  Was there another owner of the business as well?
6      A.    Yes.
7      Q.    Okay.  And it also states in there that the
8  husband will transfer his interest to you; correct?
9      A.    Yes.
10      Q.    So you walked away from your business, not
11  his business; correct?
12      A.    It was our business.
13      Q.    But he gave you his 20 percent in this
14  agreement?
15      A.    Okay.  I guess so.
16      Q.    Now, when was this house purchased, do you
17  know?
18      A.    I don't know.
19      Q.    Isn't it true that this house was owned by
20  Mr. Caputo before you were married?
21      A.    That's correct.
22      Q.    Now, at the time you were divorced, I guess
23  it was finally in November or December of 2007, you
24  said you were struggling, you didn't have any money
25  and you had all these other debt and now people are

Page 29

1   coming after you; correct?

2       A.   They are calling me, creditors.

3       Q.   Why haven't you filed a bankruptcy to get rid

4   of this debt?

5       A.   Well, that's an option that I have to

6   explore.

7       Q.   Okay.  Have you explored that in the last

8   five years?

9       A.   I've had to -- I'm waiting to see what

10  happens with this.

11      Q.   Are you working right now?

12      A.   Currently I am working, yes.

13      Q.   What do you do?

14      A.   I manage a medical spa.

15      Q.   And what's your yearly income, gross?

16      A.   It is about 25,000.

17      Q.   Okay.  And you are living where now?

18      A.   I'm living in Coconut Grove.

19      Q.   Do you have a house or an apartment?

20      A.   I'm renting a house.

21      Q.   You're renting a house and how much is the

22  rent on the house?

23      A.   The rent is 2,000.

24      Q.   $2,000 a month?

25      A.   Yes.

1    Q.    So that's 24,000 a year?

2    A.    That's correct.

3    Q.    Okay.  So that's about what you make gross.

4    So how are you paying the rest of your expenses?

5    A.    I have another business.

6    Q.    What business do you have?

7    A.    It's a business called Toluga Inco and I do

8    some marketing on the side, some Internet work, some

9    stuff from the computer from my house.

10    Q.    And how much do you gross in that business a

11    year?

12    A.    I'd have to look at my tax returns.  I don't

13    remember.  It varies.

14    Q.    Varies from what to what?

15    A.    You know some years it could be 20,000, some

16    years 5,000.  It's really as much -- as hard as I can

17    work it and how much free time I have aside from my

18    other job and going to school.

19    Q.    Okay.  Now I'm going to point you to again,

20    it's Exhibit Number 9, I believe.  That's the addendum

21    to the marital settlement agreement.  Are you familiar

22    with that document?

23    A.    Yes.

24    Q.    That was just recently signed in December

25    2012?

1    A.    Yes.

2    Q.    Did you have a lawyer at that time?

3    A.    I did.

4    Q.    Okay.  I point you to Paragraph 13.  It

5  states in Paragraph 13 that the former husband has

6  filed for bankruptcy.  We all know that to be true.

7  The former wife was therefore not able to proceed with

8  the motion to enforce the parties' marital settlement

9  agreement -- of course, that's, as we know, that you

10  couldn't do that anyway, as it relates to funds owed

11  to her by the former husband pursuant to Paragraph

12  XVIII, Paragraph B, of the agreement.

13        The former husband acknowledges that he owes

14  the former wife the sum of $210,000 as an equitable

15  distribution.  You signed this, didn't you?

16    A.    Yes.

17    Q.    And you had a lawyer at this time?

18    A.    Yes, a family lawyer.

19    Q.    You had a lawyer represent you at the time

20  you signed this agreement?

21    A.    Regarding our child support that he has

22  placed in arrears.

23    Q.    I'm not talking about child support.  I'm

24  pointing you to the Paragraph 13, which talks about

25  this $210,000 as an equitable distribution.  You

1    signed this agreement, didn't you?

2         A.   Yes.

3         Q.   Under advice from an attorney; correct?

4         A.   Yes.

5         Q.   Now I turn you to, I believe it's Exhibit

6    Number 10 and it's the second half.  It's the, I can

7    show it to you.  It's this provision right here where

8    you have a list of the payments that were made?

9         A.   Yes.

10        Q.   Okay.  And what does the title of this say?

11        A.   Caputo and Caputo, equitable distribution

12   payments to wife per marriage settlement agreement.

13        Q.   And that's a list of every nickel you've

14   received from Mr. Caputo?

15        A.    It was a list of checks that he wrote from

16   June 16th of '07 to 11/18/07, and the ones that are

17   highlighted are the ones that say settlement and the

18   ones that are not highlighted were just payments.  And

19   the Courts had to determine which he was going to get

20   credit for for child support and which he was going to

21   get credit for for equitable distribution.

22             MR. FRANK:  I have no further questions at

23   this time, Judge.

24             THE COURT:  Very well.  Any redirect?

25             MR. DIEPPA:  Very brief, Your Honor.

1                    REDIRECT EXAMINATION

2    BY MR. DIEPPA:

3         Q.    Ms. Caputo, who was the co-owner of KidScape,

4    the 50 percent that's not mentioned in the agreement?

5         A.    Her name was -- that is Paul's girlfriend.  I

6    can't remember her name.  Issette something.

7         Q.    Did you ever receive or execute any paperwork

8    where Paul transferred the 20 percent to you?

9         A.    Not that I believe.  No, not that I know off.

10   Paul handled all the paperwork, all the tax returns,

11   everything.  I, you know, I -- I don't know.

12        Q.    Do you recall what -- how your involvement

13   with KidScape terminated at the time of your divorce?

14        A.    I had to get a job that would pay me more

15   than $200 a week because that was all that the company

16   could pay me.

17        Q.    Who set your income with KidScape?

18        A.    I believe that was determined with the other

19   partner and Paul.

20        Q.    Do you know if you ever received Paul's 20

21   percent ownership and ended up remaining the 50

22   percent owner of KidScape?

23        A.    I don't know.

24             MR. DIEPPA:  No further questions, Your

25   Honor.

Page 34

```
 1            THE COURT:  Any recross?

 2            MR. FRANK:  No, Judge.

 3            THE COURT:  You may step down, you're

 4   excused.

 5            Anything further?

 6            MR. DIEPPA:  Your Honor, may we call Paul

 7   Caputo to the stand?

 8            THE COURT:  You may.

 9   THEREUPON:

10                 PAUL CAPUTO,

11   after having been first duly sworn, was examined and

12   testified as follows:

13                 DIRECT EXAMINATION

14   BY MR. DIEPPA:

15      Q.    Can you please state your name for the

16   record?

17      A.    Paul Caputo.

18      Q.    Mr. Caputo, at the time of your divorce from

19   Camile Caputo, what was your main source of income?

20      A.    At the time of the divorce I was pretty much

21   out of money.  I had been doing real estate previous

22   to that, but I really didn't have any income at that

23   point.

24      Q.    When you say you were doing real estate, can

25   you be more specific about what your income was?
```

1      A.    Everything from construction, when I had

2    money I was buying properties, fixing them up and

3    selling them.

4      Q.    At the time of your divorce with Ms. Caputo

5    in 2007, did you own any other properties, real estate

6    properties, besides the homestead?

7      A.    Yes.

8      Q.    And what were those properties?

9      A.    It was -- I had a commercial property on 7th

10   Avenue and the corporation name was PCG, and that was

11   it.

12     Q.    Do you still own that property?

13     A.    No.

14     Q.    What happened to the property?

15     A.    I believe it was lost in foreclosure.

16     Q.    Do you still own the property that we've

17   described as the marital home at 550 Northeast 56th

18   Street, do you still own that?

19     A.    No.

20     Q.    And what happened to this property?

21     A.    Foreclosure.

22     Q.    What happened to your income leading up to

23   your divorce?

24     A.    That's a broad question.  What years?

25     Q.    In 2007.  What was your income in 2007?

1      A.    Less than $15,000.

2      Q.    And do you recall what your income was in the

3    year prior?

4      A.    I don't.

5      Q.    What happened to your income?

6      A.    Well, the real estate market, as everyone

7    knows, dried up.  So, I was buying property, fixing

8    them and flipping them, trying to rent, but at that --

9    between the last six to seven in '08, and of course,

10   '09 and '10, the market dried up, so I was unable to

11   sell any assets that I had.

12     Q.    Given your income and given Camile's income,

13   given what was happening in the real estate market,

14   why did you obtain and have Camile co-sign a loan for

15   $120,000 on the homestead?

16     A.    At that point why did I have her -- repeat

17   the question.

18     Q.    Why did you obtain a loan and have Camile

19   co-sign with you, which is exhibit --

20             MR. DIEPPA:  Your Honor, may I approach?

21             THE COURT:  You may.

22             MR. FRANK:  Is there not a book up there

23   already?

24             MR. DIEPPA:  No.

25   BY MR. DIEPPA:

1    Q.    Exhibit C-5, if you'll turn to the tab that

2  says 5.  This is a loan that you and Camile took out

3  with Arista Mortgage; correct?

4    A.    Correct.

5    Q.    Why did you have this loan taken out given

6  the fact that neither you nor Camile had much income?

7    A.    We didn't have any money to live on at that

8  time.

9    Q.    Why didn't you sell your home rather than

10 take out new debt?

11    A.    Why didn't I sell the home?  We didn't have

12 time to do anything at that point.  We were both --

13    Q.    Camile testified that, or Ms. Caputo

14 testified that at the time of the divorce she believed

15 the property was worth $900,000 the marital property.

16 I'm referring to the marital property.  Do you agree

17 that the property was worth, approximately, $900,000

18 at the time?

19    A.    I wouldn't be able to tell from seven years

20 ago.  I know three years later it was worth 550, so I

21 don't know.

22    Q.    What were the mortgage payments on that

23 marital home at the time of your divorce?

24    A.    I don't recall.

25    Q.    Was there another primary mortgage on that

1    property?

2          A.    Wachovia.

3          Q.    Do you recall what the mortgage payments were

4    on the property?

5          A.    If I had to guess.

6          Q.    As best as you can recall.

7          A.    2,500 to 3,000.

8          Q.    And this was a second -- this Arista Mortgage

9    was a second mortgage you took out on the house?

10         A.    Yes.

11         Q.    So you had your first mortgage was

12   approximately 2,500 per month; correct?

13         A.    That would be combined first and second.

14         Q.    The 2,500 included this Arista Mortgage?

15         A.    No.

16         Q.    It was 2,500 and then --

17         A.    You said previous to that; correct?

18         Q.    Yes.  At the time of your divorce.  I'm

19   trying to understand you.

20         A.    So we are skipping forward three months,

21   okay.  And when you say divorce, you mean November of

22   '07?

23         Q.    November of 2007.

24         A.    Okay.

25         Q.    What were the debts you had, you had how many

1    loans on your property?

2        A.    I don't recall, but it's public record.

3        Q.    This new loan that you took out with Arista

4    Mortgage that was $1,200 per month?

5        A.    I don't know if that was it, but I think it

6    was a balloon from what I recall.  I don't think there

7    was a payment amount.

8        Q.    Can you look at the second to last page of

9    this Exhibit C-5.  Can you look at that second

10   paragraph that says, in the second paragraph, the

11   promissory note?

12       A.    Okay.

13       Q.    Did you have an obligation to pay monthly

14   interest payments to Arista Mortgage?

15       A.    According to this, yes.

16       Q.    How were you going to pay Arista Mortgage

17   $1,200 per month and also pay the first mortgage, or

18   first and second mortgage on the property, when you

19   were making $15,000 per year?

20       A.    I was anticipating making money to be honest.

21   I had business deals that were expected to happen, but

22   never materialized, so --

23       Q.    Those business deals did not materialize?

24       A.    Correct.

25       Q.    Did you receive the hundred and twenty

Page 40

1    thousand dollars from Arista Mortgage?

2        A.    Yes.

3        Q.    What did you do with the $120,000?

4        A.    I paid debt on the house.  I paid personal

5    debt.  I paid Camile's debt off.  I gave her money to

6    prior to June 7th, which isn't in any records which I

7    have obviously checks of.  And I kept us alive and put

8    food on the table for a while.

9        Q.    Did you ever consider selling the property,

10   paying off the first mortgage and living off the

11   proceeds from the sale of the house rather than taking

12   on new debt?

13       A.    Absolutely.  I put it up for sale.

14       Q.    And you never received an offer?

15       A.    No.  The market was falling quickly at that

16   time.

17       Q.    Did you ever make any payments to Arista

18   Mortgage on this loan?

19       A.    On this loan, no, not that I recall.

20       Q.    Is Arista Mortgage one of the creditors that

21   you list in your bankruptcy schedules?

22       A.    Yes.

23       Q.    You filed an objection to Camile's claim;

24   correct?

25       A.    I don't know if I did or not.  That would be

1  a question for my attorney.

2      Q.    Is your debt to Camile paid in full?  And

3  when I say the debt, I'm referring to the equitable

4  settlement referenced in your divorce.  Is it your

5  position that you've paid that $200,000 equitable

6  settlement in full?

7      A.    No, it's actually -- if you read the -- what

8  we signed in December, that is clearly stated.

9      Q.    What was the reason that the $200,000 was not

10  paid to Camile Caputo?

11      A.    I didn't have any money at all, let alone

12  $200,000.  That was when the market had collapsed, as

13  I explained earlier, so any equity in assets that I

14  had at that time were virtually evaporating.

15      Q.    Why did you sign a settlement agreement with

16  Camile Caputo that provides a payment schedule wherein

17  you would pay $200,000 over the next 18 months while

18  only earning $15,000 annually?

19      A.    Optimist.  Like I said, I was a -- I had some

20  deals going on that I planned on making it, so it was

21  probably a bad move on my part.  I probably should

22  have gone to court and just fought over assets, but I

23  was trying to do the right thing and it obviously blew

24  up in my face because I did not have the money and it

25  didn't -- it took several years.

Page 42

1      Q.    Who prepared the marital settlement

2  agreement?

3      A.    Myself.   The first one?

4      Q.    The document you signed which is C-1, which

5  is your marital settlement agreement?

6      A.    That was in June of 2007?

7      Q.    It's dated June of 2007 --

8      A.    Uh-huh.

9      Q.    -- and it's made part of your final judgment

10  of dissolution, which is part of the same exhibit, as

11  dated June 13th, 2007.  Who prepared this?

12      A.    Myself.

13      Q.    Did you have the assistance of an attorney?

14      A.    Not when I finalized it, no.

15      Q.    You negotiated all of these terms with Camile

16  and prepared it yourself?

17      A.    Correct.

18      Q.    And what role did your attorney have in terms

19  of this divorce?

20      A.    I had an attorney that really didn't get into

21  it until after.

22      Q.    But what did that attorney do for you?

23      A.    We went to court over child support and it

24  was a child support issue.

25      Q.    Do you agree that the $200,000 that you

1   agreed to pay Camile was in the nature of alimony?

2       A.    No.

3       Q.    You don't agree with that?

4       A.    No, it never was.

5       Q.    Did you discuss with Camile in April of 2007

6   that the $200,000 that she would receive was going to

7   be lump sum alimony?

8       A.    I don't recall.

9       Q.    Can you look at Exhibit C-8.  Who prepared

10  that document?

11      A.    Not me.

12      Q.    Do you know who prepared it?

13      A.    No.

14      Q.    Do you agree that it states that in that

15  first paragraph, the sum of 200,000 as lump sum

16  alimony settlement payment?  Do you agree that what I

17  am reading is what that document states?

18      A.    Do I agree that that says the sum of 200,000

19  as lump sum alimony?

20      Q.    Yes.

21      A.    That's what it does say, yeah.

22      Q.    Did you discuss with Camile in April of 2007

23  that what she would receive from the divorce would be

24  $200,000 of lump sum alimony?

25      A.    Did I discuss that she would receive 200,000

Page 44

1   in lump sum alimony?

2        Q.   Did you have --

3        A.   I don't recall that to be honest with you.

4        Q.   Why did you sign this?

5        A.   Because I don't think we had food at all at

6   that point.  So, this is something that was out of

7   necessity so that we could eat and then the two of us

8   lived -- she actually went away for the four months

9   after that, after we signed this, that I paid for that

10  I don't get credit for, it was not part of the

11  settlement, it was just checks that I wrote out.  It

12  was not evidenced by your checks.  So that was the

13  money that that was used for.

14       Q.   Did you ask Camile to sign this as an

15  incentive to induce her to sign the loan with you for

16  $120,000 with Arista Mortgage?

17       A.   She made me sign this.

18       Q.   She made you sign this?

19       A.   Correct.

20       Q.   And did you ask her to sign the loan for the

21  hundred and twenty thousand dollars?

22       A.   We both had to, yeah.

23       Q.   Did -- were you the one who initiated the

24  process of seeking the hundred and twenty thousand

25  dollar loan?

Page 45

1        A.    Yes.

2        Q.    What was Camile's response to your request to

3   co-sign this loan?

4        A.    She just wanted money from me at that time.

5   I don't know what the terms were.  I think she just

6   wanted money from me.  It was prior to us getting

7   divorced.

8        Q.    At that time you did not have money; correct?

9        A.    At that time I had no money.  I only had the

10  house.

11       Q.    This document, C-8, did Camile present the

12  document to you as a condition to co-signing the loan

13  with you, the mortgage on the house?

14       A.    I think so, but again, that was seven years

15  ago.

16       Q.    Do you agree that Camile asked you to sign

17  this to ensure that she would be paid alimony because

18  the document you prepared said that she was giving up

19  alimony?

20       A.    My document wasn't even done at that point.

21  It was inaccurate that it was done prior to this.

22       Q.    When did you prepare the marital settlement

23  agreement?

24       A.    I don't recall, I don't.  But it wasn't

25  signed until June, so it was two months after this,

Page 46

1    and I had already given her money between the two

2    dates.

3        Q.    You don't know exactly when you prepared the

4    marital settlement agreement?

5        A.    I don't.

6        Q.    Who ended up having primary custody of your

7    child from the marriage with Camile after the divorce?

8        A.    Camile had primary custody.

9        Q.    Camile.  Were you earning income from PCG

10   Capital at the time of your divorce?

11       A.    If anything, it was minimal.  I don't recall

12   what because there was really no money there.

13       Q.    What was the value of the property owned by

14   PCG Capital at the time of your divorce?

15       A.    If I had to guess, 300,000.

16       Q.    Why didn't you sell that property to obtain

17   cash?

18       A.    I don't think I was able to for some reason.

19   We were trying to either fix it, it was unfinanceable,

20   there was something was wrong with the property

21   preventing us, as I recall.

22       Q.    Do you agree that Camile gave up her rights

23   to the property at 550 Northeast 56 Street as part of

24   the divorce?

25       A.    Did she give up her rights?

1    Q.    She transferred title to you?

2    A.    She never had title.  It was my house and I

3 was single prior to.

4    Q.    Was Camile ever on the title to the property?

5    A.    Never.

6    Q.    How many years were you married to Camile?

7    A.    Four.  Four and a half.

8    Q.    And you continued residing at 550 Northeast

9 56 Street after the divorce?

10    A.    Shortly after, yeah.

11    Q.    Until when?  How long did you live there for?

12    A.    In total or after the divorce?

13    Q.    In total since the divorce?

14    A.    Like four years.

15    Q.    Are you still living there?

16    A.    No.  The house has been gone for a year and a

17 half.

18    Q.    Why wasn't the full hundred and twenty

19 thousand dollars from that mortgage to Arista paid

20 directly to Camile in settlement of the $200,000 that

21 was owed to her?

22    A.    That wasn't the deal.  We were both living

23 off the money at that time.

24    Q.    Did you ever transfer your shares of KidScape

25 to Camile as part of your divorce?

1        A.    I don't recall what we did, but I know -- I
2   really didn't have any hand-on in KidScape at all
3   except physically building it and paying for it.
4   Other than that, I've never written a check out for
5   KidScape.
6        Q.    Who was the co-shareholder, the other 50
7   percent owner that's not identified in the agreement,
8   but who owned that remaining 50 percent?
9        A.    The original partner was Camile's good
10  friend, Barclay Corporan, and then after that it was
11  Issette DeCarlo.
12       Q.    And was Issette De Carlo the co-owner at the
13  time of the divorce in November?
14       A.    I don't think so.  I don't recall.
15       Q.    Did you ever draw income from KidScape at the
16  time of your divorce?
17       A.    Not a penny.
18       Q.    What happened to KidScape?
19       A.    What happened to it?
20       Q.    Is it an active business?
21       A.    You probably would have to ask Camile because
22  I had nothing to do with the running of the business
23  or like I said, I only built it and paid for it to be
24  built and then inherited a $10,000 debt after it was
25  closed and she walked away.

Page 49

1    Q.   After your divorce did your income change,
2 did you continue earning $15,000 a year?
3    A.   Until 2010 is when I really gained
4 employment, changing industries.
5    Q.   How much did you make in 2010?
6    A.   Seventy -- I don't recall.  $70,000.
7    Q.   Why didn't you make payments to Camile in
8 2010 towards the $200,000 debt?
9    A.   I think I paid her, it was mostly going
10 towards child support at that point.  I didn't have
11 anything above and beyond.  Everything went towards
12 child support.
13         MR. DIEPPA:  Thank you, Your Honor.  No
14 further questions.
15         THE COURT:  Cross-examination.
16              CROSS-EXAMINATION
17 BY MR. FRANK:
18    Q.   Good afternoon, Mr. Caputo.
19    A.   Hi.
20    Q.   I'm going to refer you to that marital
21 settlement agreement which is at Exhibit 1, and ask
22 you to turn to Page 7.  It's Paragraph X, Roman
23 Numeral X, the voluntary execution.
24    A.   Yes.
25    Q.   Are you familiar with this paragraph?

Page 50

1        A.    Yes.

2        Q.    Would you say that both of you had the

3   opportunity to obtain independent counsel to review

4   this agreement?

5        A.    Yes.

6        Q.    And both of you signed this agreement on Page

7   23 of this; correct?

8        A.    Yes.

9        Q.    Now, in 2007 when this stuff, I will call it

10  for lack of a better term, was going on between you

11  and your wife, you originally signed that document

12  which is referred to as Exhibit Number 8, that one

13  paragraph agreement, that was in April of 2007; right?

14       A.    Yes.

15       Q.    You weren't divorced yet, were you?

16       A.    No.

17       Q.    And there was no divorce pending at that

18  time?

19       A.    We had been pending talking about divorce for

20  years prior to that, so --

21       Q.    But, originally, that agreement was supposed

22  to be paid upon the sale and closing of the property;

23  right?

24       A.    Yes.

25       Q.    Okay.  And then the actual marital settlement

Page 51

1    agreement, which I believe was signed in June of 2007?

2        A.    Yes.

3        Q.    And the divorce was final some time in

4    November or December of 2007?

5        A.    In November.

6        Q.    Okay.  Now, what was going on with the real

7    estate market in the summer of 2007?

8        A.    It was actually probably, it was right at the

9    peak in the summer.

10       Q.    And then what happened to the real estate

11   values?

12       A.    Right around November when we -- the ink was

13   still wet, was when the market started to fizzle,

14   disappearing.

15       Q.    Now, you have already testified that this

16   house that you lived in was owned by you prior to your

17   marriage?

18       A.    Yes.

19       Q.    Do you remember when you purchased that home?

20       A.    October of '99.

21       Q.    October of '99 and you got married when?

22       A.    2002.

23       Q.    Okay.  So there was a period of time where

24   you owned it, it was all yours, you got married and

25   you were divorced after approximately, four years?

Page 52

1      A.     Uh-huh.

2      Q.     And during that time period of -- from 1999

3   to about 2003, there was an increase in the value of

4   that property; correct?

5      A.     Yes.

6      Q.     And then in 2007, we all know what happened

7   to the market and it went way down.

8      A.     Yes.

9      Q.     Okay.

10              MR. FRANK:  No further questions, Judge.

11              THE COURT:  Any redirect within the scope

12   of the cross?

13                    REDIRECT EXAMINATION

14   BY MR. DIEPPA:

15      Q.     Mr. Caputo, did you rent out the marital home

16   after the divorce?

17      A.     Rent it out?

18      Q.     Did you ever rent the property out?

19      A.     I had some people stay -- I had a friend stay

20   there for a short time.

21      Q.     Was that immediately after the divorce or

22   years after?

23      A.     That was after.

24      Q.     And how much did you rent that out for?

25      A.     I don't recall.

Page 53

1      Q.    When did you stop making payments on the
2  house?
3      A.    I have no idea.  I don't recall.
4      Q.    Were you making payments on the house at the
5  time of the divorce, on your first mortgage?
6      A.    Yes.
7      Q.    How were you able to make the payments on the
8  first mortgage?
9      A.    With the money I borrowed to.
10     Q.    How long did that money last you?
11     A.    I think probably right until, if I'm
12 guessing, before Christmas.
13     Q.    Christmas of?
14     A.    That same year, '07.  After paying off all of
15 -- both of our debts as much as possible.
16     Q.    Camile was never added to the title of the
17 home; correct?
18     A.    Never.
19     Q.    Why was the settlement agreement written with
20 references to the sale of the home if she was never on
21 title to it?
22     A.    Because that's what she was seeking.  It was
23 either I went through a lengthy court process to prove
24 that I owned the house or just try to settle to get
25 her off my back at that point, and I didn't even have

1    the 200,000 at that point, it was just my best effort,

2    so, yeah.

3        Q.    If you knew that you could not have made the

4    payments in that payment schedule, why was it written

5    that way by you?

6        A.    In the house?  If you could rephrase that.

7        Q.    The marital settlement agreement provides for

8    a schedule of payments?

9        A.    Uh-huh.

10        Q.    You prepared the marital settlement

11    agreement; correct?

12        A.    Uh-huh.

13        Q.    You set up schedule of the payments that were

14    to be made?

15                MR. FRANK:  Hold it.  You have to answer.

16                THE WITNESS:  Yes.

17    BY MR. DIEPPA:

18        Q.    The $200,000 was going to be paid over 18

19    months; correct?

20        A.    Yes.

21        Q.    You knew that you were only making $15,000 at

22    that time, annually?

23        A.    Yes.

24        Q.    Why did you write in those terms when you

25    knew that you could not possibly comply with those

1    terms?

2        A.    At the time when we did that, like I was

3    explaining earlier, I was doing -- I come from a

4    finance background, so I was doing a venture

5    capitalist deal and I really honestly thought that I

6    was going to be making good money, more lump sum stuff

7    kind of business is what I was doing, and I

8    anticipated being able to pay her off and I was

9    honestly not thinking I was going to even have to sell

10   the house, but we all know that didn't happen.

11       Q.    You believed that you were going to be able

12   to pay off the $200,000 within 18 months at the time

13   that you executed this agreement?

14       A.    I believed it.

15       Q.    What was the nature of this business deal

16   that you were going to come into such money?

17       A.    Venture capitalist, sort of like my

18   background was previous to 2000.

19               MR. DIEPPA:  Your Honor, no further

20   question.

21               THE COURT:  Okay.  Any recross?

22               MR. FRANK:  Yes, Judge.

23                     RE-CROSS EXAMINATION

24   BY MR. FRANK:

25       Q.    You were asked a question about your income

1    in 2010?

2         A.    Yes.

3         Q.    You said you started working and making about

4    seventy or eighty grand.  And you'd also been in a

5    bankruptcy in 2010; correct?

6         A.    Yes.

7         Q.    It was filed in February of 2010?

8         A.    Yes.

9         Q.    And that was part of the same situation where

10   you were contending that this was a debt that was

11   dischargeable in the bankruptcy?

12        A.    Correct.

13             MR. FRANK:  No further questions.

14             THE COURT:  Okay.  Anything else?

15             MR. DIEPPA:  No further questions.

16             THE COURT:  No further witnesses.  You

17   will rest.  You may step down, sir.

18             Mr. Frank, what do you wish to present?

19             MR. FRANK:  Your Honor, the Court has

20   heard the testimony.

21             THE COURT:  Okay.  Then the respondent

22   rests?

23             MR. FRANK:  Yes, Your Honor.

24             THE COURT:  Okay.  The Court has heard the

25   testimony and is aware that the issue here is whether

1    this obligation of approximately $200,000, I forget

2    what the precise number is, is in the nature of a

3    domestic support obligation or whether it was a

4    property settlement which is dischargeable in

5    bankruptcy.

6            The Court will need to carefully

7    re-examine the papers.  The law is clear that,

8    notwithstanding what it says in the State Court, this

9    Court has a right to review the matter to determine

10   whether or not it is a domestic support obligation,

11   and a duck is a duck even if you hang a sign on it

12   that say it's a cow.

13           And so, the Court will make such a review

14   and give each counsel an opportunity to present

15   anything that they wish in the nature of closing

16   arguments, combined with citations of authority in

17   support of their clients' respective positions.

18           How much time do you need to present

19   orders?  I'm going to be away for over 10 days, so at

20   least 14 days, unless you need more.

21           MR. DIEPPA:  14 days.

22           THE COURT:  14 days.  So today is the

23   16th, so that will be 30th.

24           MR. FRANK:  I believe that is right.

25           THE COURT:  So orders by 30 May, 2013, and

1  the issue is -- the primary issue is is the claim of

2  Ms. Caputo a domestic support obligation, non-

3  dischargeable, or is it not a domestic support

4  obligation and, therefore, dischargeable.  Anything

5  else?

6              MR. FRANK:  That sums it up.

7              MR. DIEPPA:  Yes, Your Honor, it's clear.

8              THE COURT:  Okay.  Thank you both.

9              MR. DIEPPA:  Thank you.

10             MR. FRANK:  Thank you, Your Honor.

11             THE COURT:  Thank you all and we'll look

12  for your orders.

13          (Thereupon, the hearing was concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 59

1                          CERTIFICATION

2

3    STATE OF FLORIDA )

4                              )

5    COUNTY OF MIAMI-DADE)

6

7              I, Carmen E. De La Cruz, Shorthand Reporter

8    and Notary Public in and for the State of Florida at

9    Large, do hereby certify that the foregoing

10   proceedings were taken before me at the date and place

11   as stated in the caption hereto on Page 1; that the

12   foregoing computer-aided transcription is a true

13   record of my stenographic notes taken at said

14   proceedings.

15

16

17             WITNESS my hand this 11th day of September,

18   2013.

19

20

21                         _____

22                         Carmen E. De La Cruz

23                         Court Reporter and Notary Public

24                         DD545111 Expiration Date 08/2014

25